Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7049 | **DATE** | 3/12/2001 |
| **CASE TITLE** | Vigortone AG Products, Inc. vs. PM AG Products, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 30 Mar. 01 at 9:00 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: PM Ag's motion for summary judgment is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | MAR 13 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| WAP | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VIGORTONE AG PRODUCTS, INC.,
formerly known as Provimi
Acquisition Corporation,

    Plaintiff,

v.

PM AG PRODUCTS, INC.,

    Defendant.

Case No. 99 C 7049

Judge Harry D. Leinenweber

DOCKETED
MAR 13 2001

## MEMORANDUM OPINION AND ORDER

Some little pigs go to market; some stay home. Vigortone Ag Products comes to court. Vigortone Ag Products ("Vigortone"), formerly known as Provimi Acquisition Corporation, brings negligent misrepresentation, Delaware Consumer Fraud Act (the "DCFA"), breach of contract, fraud and equitable relief claims against PM Ag Products, Inc. ("PM Ag") stemming from Provimi Acquisition Corporation's purchase of Vigortone from PM Ag. PM Ag asks the Court to send Vigortone crying all the way home by granting summary judgment on all counts.

### BACKGROUND

Vigortone is a Delaware corporation with its principal place of business in Cedar Rapids, Iowa. Vigortone produces and sells premix and other products to livestock farmers for inclusion in animal feed. On April 27, 1998, PM Ag, a California corporation with its principal place of business in Illinois, sold Vigortone to

Provimi Acquisition Corp., a Delaware corporation. Provimi Holding, B.V. formed Provimi Acquisition for the sole purpose of acquiring Vigortone, with Provimi Acquisition adopting Vigortone's name after the purchase.

Provimi Holding is a worldwide business that produces and sells feed products for domesticated farm animals, with approximately $1 billion in sales. (Def.'s 56.1 Stmt. ¶¶ 1, 3.) It has acquired approximately 30 companies since 1988. (Def.'s 56.1 Stmt. ¶ 8.) Provimi Holding's Merger and Acquisition Department handles this acquisition activity. (Def.'s 56.1 Stmt. ¶ 7.) For efficiency, the Court will refer to post-acquisition Vigortone and Provimi's two corporations as "Provimi."

According to Provimi, PM Ag approved a pig placement program for Vigortone in 1997, the purpose of which was to improve sales of pig premix. (Pl.'s 56.1 Stmt. ¶ 11.) Under the program, Vigortone would place aspiring young pork chops with farmers who would agree to feed them Vigortone's premix. (Pl.'s 56.1 Stmt. ¶ 12.) In 1997, Vigortone entered into seven long-term pig purchase contracts obligating Vigortone to purchase young pigs at fixed prices. (Pl.'s 56.1 Stmt. ¶ 19.) The contracts ranged in duration from three to ten years and called for the delivery of as many as 8,800 pigs per week for a total of 3 million pigs over the life of the contracts. (Pl.'s 56.1 Stmt. ¶ 19.) Vigortone intended to sell the pigs to other farmers in an effort to obtain their premix

business, (Def.'s 56.1 Stmt. ¶ 14; Pl.'s 56.1 Stmt. ¶¶ 11-12, 19), but the pig purchase contracts themselves did not provide for such sales. (Def.'s 56.1 Stmt. ¶ 15; Pl.'s 56.1 Stmt. ¶ 15.)

Before Vigortone could enter into any offsetting contracts, the bottom fell out of the pig market. (Pl.'s 56.1 Stmt. ¶¶ 22-23.) Under the contracts, Vigortone began to take delivery of pigs by the fall of 1997. (Pl.'s 56.1 Stmt. ¶ 24.) However, Vigortone had no facilities in which to house the pigs, and it began to sell them to farmers. (*Id.*) Pig prices had declined, and according to Provimi, Vigortone had suffered losses of several hundred thousand dollars by the time Provimi purchased Vigortone from PM Ag. (Pl.'s 56.1 Stmt. ¶¶ 22, 25, 77.) By the end of August 2000, losses under the pig purchase contracts totaled approximately $9,700,000. (Def.'s 56.1 Stmt. ¶ 72.)

After learning that Provimi's parent corporation had an interest in purchasing Vigortone, Mike Reed, PM Ag's president, sent Provimi's representatives a videotape outlining Vigortone's business. (Pl.'s 56.1 Stmt. ¶ 41.) Provimi representatives, Wim Troost, Larry Schaab, Stoffel Flikweert, and Cor Kik, viewed Reed's video, in which he described the pig placement program as a project that required "no cash expenditure." (Pl.'s 56.1 Stmt. ¶¶ 42-43.) In November 1997, Provimi representatives met with Reed and Gerry Daignault, PM Ag's chief financial officer. (Pl.'s 56.1 Stmt. ¶ 47.) Troost asked Reed whether Vigortone's pig placement program

involved any market risk, to which Reed responded, "no, not at all." *Id.* Reed allegedly explained that the pigs "passed through [Vigortone] to suppliers without any cash disbursements whatsoever." *Id.* At the same meeting, Daignault also allegedly assured Provimi's representatives that the pig placement program insulated Vigortone from any market risk. (Pl.'s 56.1 Stmt. ¶ 49.)

Provimi thought it was having roast beef; in fact, it had none. Provimi contends that PM Ag withheld the pig purchase contracts from its representatives and misled its representatives about the true mechanics of the pig placement program. PM Ag prepared a "Data Room" for Provimi's representatives for the November 1997 meeting, and while the Data Room index referred to "F/Y 1998 Pig Source Agreements," the pig purchase agreements were not in the room. (Pl.'s 56.1 Stmt. ¶ 54.) During the final due diligence, PM Ag allegedly told Provimi's accountants that Vigortone "was not taking ownership or title to any [pigs]," and that "Vigortone is not in the business of buying and selling pigs." (Pl.'s 56.1 Stmt. ¶¶ 63, 67.) When Bonnie Hinrichs, one of the accountants performing Provimi's due diligence, asked Daignault whether Vigortone had any significant purchase commitments, he told Hinrichs that, other than a commodity purchase agreement of a Vigortone subsidiary, Vigortone had no significant purchase commitments. (Pl.'s 56.1 Stmt. ¶ 68.)

Provimi also alleges that PM Ag concealed the fact that Vigortone owned any pigs and that it had already sustained losses under the pig purchase contracts. Daignault allegedly told Daniel Daughtery, another accountant conducting Provimi's due diligence, that the pig placement program would have no effect on Vigortone's financial statements other than some minor administrative costs. (Pl.'s 56.1 Stmt. ¶¶ 62-63.) According to Provimi, Daignault instructed Steve Beck, a PM Ag corporate controller, not to report the losses on the final closing financial statements. (Pl.'s 56.1 Stmt. ¶ 78.) PM Ag allegedly hid the inventory of pigs and losses incurred from selling them on the open market by accounting for both under "Miscellaneous Accounts Receivable." (Pl.'s 56.1 Stmt. ¶ 76.) As a result, the accountants concluded that the pig placement program presented no market risk. (Pl.'s 56.1 Stmt. ¶ 69.)

Nevertheless, Terrence Quinlan, in-house counsel at Provimi's sister company Central Soya, reviewed all of Vigortone's contracts for provisions regarding assignability. (Pl.'s 56.1 Stmt. ¶¶ 82, 84.) During this review, Quinlan read the pig purchase contracts, although Provimi maintains that he was not asked, nor did he attempt, to analyze the commercial terms of the contracts. (Pl.'s 56.1 Stmt. ¶ 86.) Quinlan apparently was not aware of PM Ag's representations concerning the pig placement program and therefore had no reason to suspect their importance. (Pl.'s 56.1

Stmt. ¶ 83.) Quinlan sent Provimi a draft of Asset Purchase Agreement Schedule 3.9, which purported to list all of Vigortone's contractual liabilities, and it listed six of the seven pig purchase contracts. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 8; Pl.'s 56.1 Stmt. ¶¶ 93-94.) However, no one at Provimi ever reviewed that draft schedule. (Pl.'s 56.1 Stmt. ¶¶ 93-94.)

The Asset Purchase Agreement ("Agreement") itself contains several relevant passages. Section 10.14 states:

> <u>Memorandum; Disclaimer and Projections</u>. Sellers and PM Ag make no representation or warranty to Buyer except as specifically made in this Agreement. In particular, Sellers and PM Ag make no representation or warranty to Buyer with respect to (a) the information set forth in the Confidential Memorandum distributed in connection with the transactions contemplated hereby or (b) any financial projection or forecast relating to Sellers. With respect to any such projection or forecast delivered by or on behalf of Sellers to Buyer, Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts, (ii) it is familiar with such uncertainties, (iii) it is taking full responsibility by making its own evaluation of the adequacy and accuracy of all such projections and forecasts so furnished to it and (iv) it shall have no claim against Sellers or PM Ag with respect thereto.

Section 3.28 declares:

> <u>Disclosure</u>. To the best knowledge of each Seller and PM Ag, none of the representations or warranties of Sellers and PM Ag contained herein, none of the information contained in the Schedules referred to in <u>Article III</u>, and none of the other information or documents furnished to Buyer or any of its representatives by Sellers, PM Ag or any of their respective representatives pursuant to the terms of this Agreement, is false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements herein or therein not misleading in any material respect. To the best knowledge of each Seller and PM Ag, there is no fact

which adversely affects or in the future is likely to adversely affect the Purchased Assets or the Business in any material respect which has not been set forth or referred to in this Agreement or the Schedules hereto.

Provimi concedes that summary judgment should be granted with respect to its negligent misrepresentation and DCFA claims. Thus, only Provimi's fraud, breach of contract, and equitable relief claims are examined below.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, the Court construes all facts in the light most favorable to the non-moving party and draws all reasonable and justifiable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Freeman v. Madison Metropolitan School District*, 231 F.3d 374, 379 (7th Cir. 2000), quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## DISCUSSION

### Choice of Law

The Agreement contains a choice-of-law provision requiring it to be governed and construed under Delaware law. This does not necessarily apply to Provimi's fraud and equitable relief claims, given that PM Ag's made the allegedly fraudulent misrepresentations in Illinois. However, the defendant asserts, and plaintiff does not dispute, that Illinois law governs Provimi's fraud and equitable relief claims while Delaware law governs Provimi's breach of contract claim. When the parties agree on the law governing a dispute and there is at least a reasonable relationship between the dispute and the forum whose law has been selected by the parties, a court may forego an independent analysis of the choice of law issue and apply the parties' choice. *Harter v. Iowa Grain Co.*, 220 F.3d 544, 560 n. 13 (7th Cir. 2000)(quotation omitted). Furthermore, the Court's decision would be unaffected by application of either Illinois or Delaware law. The Court therefore accepts, without deciding, that Illinois law applies to Provimi's fraud and equitable relief claims and Delaware law applies to its breach of contract claim.

### Ripeness

According to PM Ag, any claims that Provimi might have against it are not ripe for adjudication. PM Ag argues that the existence and the amount of Provimi's damage claims are speculative because

they are based on the future and unknown price of pigs and other commodities, as well as premix future sales. PM Ag points out that between April 2000 and August 2000, Provimi's losses under the pig purchase contracts narrowed from $10,622,000 to $9,700,000 due to the recovering pig market. It will be impossible to determine whether Provimi has sustained any losses, according to PM Ag, until the contracts expire.

It is true that claimants cannot generally seek damages for fraud before the fraud has harmed them, and if the damages cannot yet be quantified, a damages suit may be premature. *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 526 (7th Cir. 1993). However, a buyer may suffer damages when the item purchased is not what the seller represented it to be. *Asad v. Hartford Life Insurance Co.*, 116 F.Supp.2d 960, 963 (N.D. Ill. 2000)(ruling that the plaintiff did not have to suffer a monetary loss before bringing suit). In such cases, the loss suffered by claimants is the difference between the value of the item they were promised and the value of the item as purchased. *Id.; In re Merrill Lynch Limited Partnerships Litigation*, 154 F.3d 56, 59 (2nd Cir. 1998).

Here, PM Ag allegedly told Provimi that Vigortone would not take title to any pigs under the pig placement program. The contracts require Vigortone to purchase thousands of pigs, however, something that Provimi apparently did not appreciate before buying

- 9 -

Vigortone. Furthermore, the fact that Provimi's losses narrowed from $10,622,000 to $9,700,000 over a four-month period does not eliminate the fact that Provimi has lost money as a result of the pig purchase program. Only the issue of whether those damages will be offset by future events remains speculative. *See Edward Gray Corporation v. National Union Fire Insurance Company of Pittsburgh*, 94 F.3d 363, 369 (7th Cir. 1996). The Court therefore declines to dismiss Provimi's claims as unripe.

As a final matter regarding this issue, the Court notes PM Ag's objection to any attempt by Provimi to counter this argument with evidence from its damages expert, Paul Charnetzki. PM Ag should rest assured that the Court refrained from basing its decision on information provided by Charnetzki.

### Fraud

To establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce the plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance. *Connick v. Suzuki Motor Company*, 174 Ill.2d 482, 496, 675 N.E.2d 584, 591 (1996); *Houben v. Telular Corporation*, 231 F.3d 1066, 1074 (7th Cir. 2000). In this case, the parties collide over the element of justifiable reliance, with

PM Ag proposing three arguments in support of its contention that Provimi did not justifiably rely on any alleged misrepresentations.

PM Ag first argues that the Agreement directly contradicts the alleged oral misrepresentations, and therefore Provimi is not entitled to rely on the alleged misrepresentations as a matter of law. PM Ag contends that Provimi could have discovered the absence of offsetting contracts by merely reading the Agreement and the pig contracts, which were identified in Schedule 3.9 of the Agreement. Indeed, Seventh Circuit precedent holds that a fraud claim will be thwarted when the terms of a written agreement directly contradict alleged oral misrepresentations. *See Carr v. Cigna Securities, Inc.*, 95 F.3d 544 (7th Cir. 1996) (disallowing fraud claim based on oral misrepresentations that investments were safe when the agreements explicitly stated that the investments were highly speculative and risky); *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955, 961 (7th Cir. 1998) (holding that plaintiffs could not satisfy reliance element when health plan summaries explicitly reserved for defendant the right to change the plan).

In the cases cited by PM Ag, the contracts by themselves explicitly contradicted the oral misrepresentations. For the written word to trump oral declarations, however, the written words must be "true, clear, and complete." *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1325 (7th Cir. 1988). Schedule 3.9 by itself fails to tip off the reader that there are contracts for

the purchase of pigs but no offsetting contracts. Here, the Agreement alone does not explicitly contradict the alleged oral misrepresentations; only the Agreement and the contracts identified in Schedule 3.9, read together, contradict the oral misrepresentations. Furthermore, the alleged misrepresentations in this case concern the pig placement program; the Agreement never addresses the issue. The Agreement does not, therefore, supersede the oral misrepresentations. *See Astor Chauffeured Limousine Company v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1545 (7th Cir. 1990) (ruling that the written contract could not supersede oral representations because it did not address the subject of the oral representations); *Budget Rent-A-Car Corp. v. Genesys Software Systems, Inc.*, No. 96 C 0944 1997 WL 201549 (N.D. Ill. April 17, 1997)(same).

Second, PM Ag argues that Section 10.14 forecloses Provimi's reliance on any alleged oral misrepresentations. PM Ag relies heavily on *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000). The contract in *Rissman*, however, contained an anti-reliance clause explicitly stating that the complainant had not relied upon any oral representation. *Id.* at 383. In contrast, Section 10.14 simply states that PM Ag makes no representation or warranty other than those embodied in the Agreement.

In Section 3.28 of the Agreement, PM Ag warrants that none of the information furnished to Provimi or any of its representatives

is false or misleading in any material respect. Although PM Ag made no representation or warranty other than those embodied in the Agreement, it clearly certified in Section 3.28 that the information provided to Provimi was correct. Thus, the language of the Agreement allows Provimi to rely upon all of the information supplied by PM Ag, including any alleged oral misrepresentations.

The question remains whether Provimi justifiably relied on the alleged oral misrepresentations. The issue of justifiable reliance is a question of fact, but it can be decided on summary judgment when no reasonable jury could find that it was reasonable for a plaintiff to rely upon the defendants' statements. *Glass v. Kemper Corp.*, 949 F.Supp. 1341, 1350 (N.D. Ill. 1997). When deciding whether a party has justifiably relied on another's representations, a court may consider all of the circumstances surrounding the transaction, including the parties' (1) relative knowledge of the facts available, (2) opportunity to investigate the facts, and (3) prior business experience. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 371 (7th Cir. 1988) (citation omitted).

Clearly, both parties are sophisticated business entities. Given its history of acquisitions, perhaps Provimi is more sophisticated than PM Ag in matters such as this. However, when viewed in the light most favorable to Provimi, the evidence suggests that PM Ag's relative knowledge of the facts exceeded

Provimi's and that PM Ag's actions may have hindered Provimi's due diligence.

PM Ag emphasizes that Quinlan read the contracts before the sale and that he forwarded a draft of Schedule 3.9 to the Provimi representatives for approval prior to closing. Knowledge gained by a corporate agent while acting within the scope of his or her agency is normally imputed to the corporation if the knowledge concerns a matter within the scope of the agent's authority. *Chicago Title and Trust Co. v. First Arlington National Bank*, 118 Ill.App.3d 401, 407, 454 N.E.2d 723, 728 (1983)(internal quotes and citation omitted). However, corporations would be easy targets for fraud if they were precluded from recovery merely because one employee knew the truth. *Id.* Instead, examination of the reliance element focuses on the knowledge of the corporate agent who was deceived. *Id.*

The reliance element does not properly focus on what Quinlan knew, therefore, because he was not the agent who was deceived. He read the contracts prior to closing, but he was unaware of the pig placement program and could not understand the significance of the existence of contracts to purchase pigs without offsetting contracts to sell them. The scope of Quinlan's duties only involved a determination of whether the contracts could be assigned under the Agreement. A proper analysis of the justifiable reliance element focuses instead on the knowledge of the Provimi

representatives who inquired about the pig placement program and Vigortone's long-term purchase commitments.

Despite the questions Provimi's representatives asked about the pig placement program, PM Ag's representatives knew that there were no contracts in place to sell the pigs it had agreed to buy. When asked whether Vigortone had any long-term purchase commitments, PM Ag told Provimi's agents that, with the exception of an unrelated contract, it did not. PM Ag repeatedly assured Provimi that Vigortone did not take title to the pigs and that it was not in the business of buying and selling pigs. PM Ag accounted for pig placement program losses accrued as of the time of sale under "Miscellaneous Accounts Receivable." A jury could conclude that from this evidence that Provimi reasonably relied on these factual representations to their detriment.

Provimi's left hand may not have known what its right hand was doing before final closing of the deal, but contributory negligence is not a defense to an intentional tort such as fraud. *Ampat/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1041 (7th Cir. 1990). The law does not require the victim of a fraud to dig beneath apparently adequate assurances. *Id.* at 1042. Plaintiffs have a duty to investigate when circumstances require further examination as a matter of prudence. *West v. Western Casualty and Surety Co.*, 846 F.2d 387, 394 (7th Cir. 1988). However, a plaintiff's duty to investigate may be absolved when the

defendant's deliberate misrepresentations lull the plaintiff into a false sense of security, or attempt to block further inquiry. *Id.* "[I]f you ask the defrauder point blank, you need not investigate further." *Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 436 (7th Cir. 1992). Provimi conducted its own investigation, and its accountants asked about the pig placement program and long-term purchase commitments point blank. Nothing further was required.

## Breach of Contract

PM Ag also moves for summary judgment on Provimi's breach of contract claim. Provimi claims that PM Ag's alleged misrepresentations concerning the future impact of the pig purchase contracts constitutes a breach of several warranties under the Agreement. PM Ag points out that Delaware courts treat a breach of warranty claim as a species of fraud. *See Bleacher v. Bristol-Myers Co.*, 163 A.2d 526, 528 (Del. Super. Ct. 1960). Reliance is, therefore, an essential element that Provimi must establish to prove its breach of contract claim. *See Middleby Corp. v. Hussman Corp.*, No. 90 C 2744, 1992 WL 220922, at *6 (N.D. Ill. Aug. 27, 1992). As indicated above, Provimi has established a genuine issue of fact as to whether its representatives relied on alleged misrepresentations of PM Ag representatives. PM Ag argued in its reply brief that Provimi waived its breach of contract claim because it failed to cite any supporting law in its response.

However, Provimi fully addressed the reliance issue when discussing its fraud claim and therefore did not waive its claim.

### Equitable Relief

Finally, PM Ag moves for summary judgment on Provimi's claim for equitable relief. Provimi seeks partial rescission or reformation of the Agreement, or some other form of equitable relief that would shift the market risk inherent in the pig purchase contracts back to PM Ag. Provimi cannot cite any reported decision in which a court fashioned a similar remedy, but "[e]quity will not suffer a wrong to be without a remedy." *Nikola*, 25 N.E.2d 582, 587 (Ill. App. Ct. 1940). While it is quite doubtful that the Agreement could be partially rescinded, the Court will not foreclose the possibility of fashioning an equitable remedy while Provimi's fraud claim remains pending should monetary damages prove to be insufficient compensation.

### CONCLUSION

These little pigs will not go home; they will go to trial. For the reasons stated above, PM Ag's motion for summary judgment is granted in part and denied in part.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: March 12, 2001