Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7049 | **DATE** | 10/19/2001 |
| **CASE TITLE** | Vigortone AG Products, Inc. vs. PM AG Products, Incorporated | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: PM AG's post trial motions are denied except to the extent that the court finds that the verdicts are duplicative and accordingly the judgment is clarified to be in the total sum of $12,000,000.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | OCT 2 2 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| WAP | courtroom deputy's initials | 01 OCT 19 PM 3:05 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
OCT 1 9 2001

Judge Harry D. Leinenweber
U.S. District Court

VIGORTONE AG PRODUCTS, INC.,
formerly known as Provimi
Acquisition Corporation,

    Plaintiff,

v.

PM AG PRODUCTS, INCORPORATED,

    Defendant.

Case No. 99 C 7049

Hon. Harry D. Leinenweber

DOCKETED
OCT 2 2 2001

## MEMORANDUM OPINION AND ORDER

On June 15, 2001, a jury returned verdicts in favor of Provimi on its fraud claim in the amount of $12,000,000 and on its breach of contract claim in the amount of $3,000,000. Judgment was entered on both verdicts. PM AG now brings it motion for new trial, to amend the judgments, and a renewed motion for judgment. PM AG alleges evidentiary errors, erroneous jury instructions, insufficient evidence to support the verdicts, inconsistent verdicts, and that the verdicts are against the weight of the evidence.

## EVIDENTIARY ERRORS

The first alleged evidentiary error was the refusal of the court to allow PM AG to introduce alleged admissions made by Provimi in an arbitration proceeding held prior to the trial. The basis for the court's ruling, which was made *in limine*, was a provision in the letter of engagement for the arbitrator which

provided that "neither party shall introduce as evidence in any subsequent litigation between the Parties all or any part of any submission prepared by the other party solely for the arbitration proceeding." The court declines to reconsider its previous ruling because the court believes that there is nothing in the law that disallows parties from voluntarily agreeing in advance to limit the admissibility of particular evidence. *See Puhy v. Delta Air Lines, Inc.*, 833 F. Supp. 1577, 1582 (N.D. Ga. 1993), and PM AG suggests none. If PM AG was allowed to use the arbitration submissions as "admissions," the submissions would amount to substantive evidence which was agreed not to be used in subsequent litigation. The court refuses to reconsider this ruling.

The second evidentiary ruling contested by PM AG was the court's ruling allowing parol evidence to interpret the agreement. The basis for the court's ruling was the court's determination that the asset purchase agreement between the parties contained provisions that were so arguably inconsistent that they amounted to an ambiguity. Specifically in Section 3.28 of the agreement PM AG warranted that none of the information or documents furnished Provimi was false or misleading in any material respect. However in Section 10.10, the parties agreed that there were no agreements, representations, warranties or covenants other than those expressly set forth and that the agreement, the disclosure schedules and exhibits attached were the entire agreement between the parties,

and in Section 10.14 PM AG expressly stated it was making no representation or warranty except as specifically made in the agreement. Based on the court's ruling Provimi witnesses were allowed to testify that the PM AG's assurance that its pre-contract representations regarding the pig purchase agreements and the marketing programs were neither false nor misleading was of critical importance to its decision to enter into the agreement. The court declines to reconsider this ruling believing that the contract was either ambiguous or at worst the contract can be read, as far as Section 3.28 is concerned, that PM AG warranted its pre-contract statements and submissions, which would constitute a warranty or representation cognizable under Section 10.14. The ambiguity, if there is one, is the meaning of the terms "representation" and "warranty" in this section and what was meant by "other information or documents furnished to buyer . . . by seller" in Section 3.28.

## THE JURY INSTRUCTIONS

The first instruction objected to by PM AG is Justifiable Reliance Defined. The court instructed the jury that "Provimi acted in justifiable reliance" if it did not act "recklessly . . ." PM AG argues that the Illinois Pattern Instruction does not define justifiable reliance and that Illinois law requires a person claiming fraud to have exhibited "ordinary prudence." While Illinois courts have not always been consistent in determining the

standard for justifiable reliance, the First District Appellate District in 1999 made it quite clear that it followed Prosser's "better reasoned" cases which rejected the notion that a plaintiff's negligence will bar his action for fraud. *See Nilsson v. NBD Bank of Illinois*, 247 Ill. Dec. 1, 11 (1st Dist. 1999) which cites with approval *Chicago Title & Trust Co. v. First Arlington*, 73 Ill. Dec. 626, 631 (1st Dist. 1983), which in turn relied upon Prosser and an old Illinois Supreme Court case, *Linington v. Strong*, 107 Ill. 295 (1883), which rejected negligence as a defense to an action for fraud. Accordingly, the court believes that the jury was properly instructed on the definition of justifiable reliance. *See also AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1041-42 (7th Cir. 1990) which likewise interpreted Illinois law as holding negligence not to be a bar to an action for fraud.

The other instruction objected to by PM AG was the instruction on the elements of breach of contract. PM AG contends that reliance is a necessary element of a breach of contract action under Delaware law which is applicable to this action. However the court does not believe that contract law in Delaware differs from Illinois law, *i.e.*, the elements of a breach of contract consist of a contractual obligation, a breach of that obligation and resulting damage. *Fitzgerald v. Cantor*, 1998 WL 842315, *1 (De. Ch. Nov. 6, 1998).

## SUFFICIENCY OF THE EVIDENCE

PM AG attacks the amount of the verdicts as being unsupported by the evidence. The evidence presented by the plaintiff consisted of the testimony of Paul Charnetzki, a valuation expert from Arthur Anderson. He based his damage opinion on what he perceived to be the difference in value of what Provimi thought it was buying from what it actually received. According Charnetzki, Provimi thought it was buying a food additive business that had an ongoing marketing program that was intended to increase the food additive business through pig purchase agreements that did not involve cash expenditures or risk of loss. Instead Provimi received a food additive business with a marketing program that required large cash expenditures and a substantial risk of loss. Charnetzki testified that Provimi, as of the date of trial, had paid out the sum of $12,551,000 in excess of revenues received under the marketing program, not counting the revenues from the increased food additive sales. The sums paid out resulted from buying and selling pigs, the incurring of costs associated with raising, feeding, and housing the pigs along with other costs, collectively known as yardage costs, engaging in hedging operations, and incurring costs associated with buying itself out of one of the pig purchase agreements. He further testified that at the time of the trial there was only one pig contract left which

Provimi was actively trying to shed and the best estimate of the cost to unload this contract was $3.1 million.

PM AG's arguments are two-fold: first, it contends that since Charnetzki's measure of damages was the difference between what Provimi thought it was buying and what it actually received, it was incumbent upon Provimi to prove the actual value of the business purchased; and second, Charnetzki failed to consider the profits on the premix sales gained from the pig placement marketing program in determining the loss to Provimi. In addition, PM AG relies on its expert, Kevin Dhuyvetter, a professor of agricultural economics at Kansas State University, who testified that all of the pig contracts had positive value provided that Provimi kept the pigs from the time it purchased them as weaners through sale to market and provided that the revenue from the increased feed additive business was added in to the revenue stream.

However according to the evidence viewed favorably to Provimi there was evidence of the value of the business for the jury from Provimi's prospective, which was the contract price it agreed to pay. Charnetzki did not deduct the income from the increased feed additive sales because that stream of income was taken into account by Provimi in the determining the purchase price it agreed to pay PM AG. Provimi purchased a feed business that included a pig purchase program which it was assured would pose no risk and would require no outlay of money. This proved not to be the case and

Provimi was forced to make outlays of more than $12.5 million in carrying out its obligations under the pig purchase agreements and may well be required to make a future outlay of another $3.1 million to buy itself out of the remaining pig contract. The jury was instructed without objection that it should "determine the amount of money that will reasonably and fairly compensate Provimi from the damage it has incurred and will likely incur as a result of PM AG's [fraud or breach of contract]." The $12 million returned on the fraud count is within the evidence. Dhuyvetter's opinion that Provimi should have held the pigs to market was considered by the jury which was instructed regarding Provimi's duty to mitigate its damages. The jury apparently chose not to believe Dhuyvetter.

PM AG's final contention is that the verdicts of $12 million for fraud and $3 million for breach of contract should not be aggregated because to do so would constitute double recovery. Provimi argues that they are not inconsistent because its evidence showed damage of in excess of $15.5 million and the verdict form which allowed the jury to give separate verdict amounts for the two claims were submitted by PM AG. Provimi further argues that its evidence showed future damages of more than $3 million so that the jury obviously apportioned the verdicts between incurred damages (the $12.0 million for fraud) and future damages ($3 million for breach of contract). However PM was required to submit such a

verdict form because it had admitted that it had failed to disclose one particular hog contract which the jury could have found to constitute a breach of contract. PM AG in favor of its double recovery argument points out that the jury was instructed to apply the same measure of damages to the fraud count as it did to the breach of contract count.

The court believes that the better interpretation of the jury's verdict is to find that the verdicts overlap and if they were aggregated Provimi would receive double recovery. The jury was instructed to use the same measure of damages in determining its verdicts for both fraud and breach of contract. It is not clear at all that the jury intended to apportion the damages between the two counts, since it is presumed that the jury followed the damage instruction which directed it to use the same measure of damages for each of the counts. The court concludes that it is more likely that the jury found that the fraud caused considerably more harm to Provimi than the breach of contract did. After all, Provimi's position was that it was caused to enter into a very unfavorable contract by PM AG's fraudulent representation that the pig purchase agreements did not provide what it was led to believe they provided. It was clear that if the jury found that Provimi was defrauded all of its damage was caused by fraud. The jury could easily conclude that because the contract provided for Provimi to assume (unknowingly) the risk of declining pig prices

that PM AG did not breach the contract. There clearly was no basis in the evidence to award an additional $3 million for any breach of contract on PM AG's part.

### CONCLUSION

Accordingly, the post trial motions of PM AG are denied except to the extent that the court finds that the verdicts are duplicative and accordingly the judgment is clarified to be in the total sum of $12,000,000.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date: October 19, 2001